UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY AL-DOUKHI,

     Plaintiff,

                                         Case No. 22-cv-

-vs-

                                         Hon.

JIM RIEHL'S FRIENDLY
AUTOMOTIVE GROUP, INC.,
d/b/a JIM RIEHL'S
FRIENDLY CADILLAC,
a Domestic Profit Corporation,

     Defendant.

_____

Barry S. Fagan  (P34275)
Ryan O. Rosenberg (P84530)
FAGAN McMANUS, P.C.
Attorneys for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
bfagan@faganlawpc.com
rrosenberg@faganlawpc.com
_____

## **COMPLAINT AND JURY DEMAND**

There is no other pending or resolved civil action
arising out of the transaction or occurrence
alleged in the Complaint.

     NOW COMES Plaintiff, KIMBERLY AL-DOUKHI, by and through her

attorneys, FAGAN McMANUS, P.C., and for her cause of action against the

Defendant, states as follows:

1

## JURISDICTIONAL ALLEGATIONS

1.      Plaintiff, KIMBERLY AL-DOUKHI ("Plaintiff" or "Al-Doukhi") is an individual residing in the City of Fraser, County of Macomb, State of Michigan.

2.      Defendant JIM RIEHL'S FRIENDLY AUTOMOTIVE GROUP, INC., d/b/a JIM RIEHL'S FRIENDLY CADILLAC, ("Defendant") is a Domestic Profit Corporation, operating at all times in the Cities of Clinton Township, Lapeer, and Warren, in the State of Michigan.

3.      At all relevant times hereto, Plaintiff was employed by Defendant in the City of Clinton Township, County of Macomb, State of Michigan.

4.      The amount in controversy is in excess of $75,000.00, exclusive of interest, costs, attorney fees, and punitive damages.

5.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1367 (supplemental).

## GENERAL ALLEGATIONS

6.      In December 2016, Al-Doukhi began her employment with Defendant.

7.      Al-Doukhi began her employment in a clerical position.

8.      Al-Doukhi worked her way up to her last-held position of Finance & Insurance ("F&I") Manager.

9.     At all times during her employment, Al-Doukhi was employed at Defendant's Cadillac dealership in Clinton Township, MI, on Hall Road (hereinafter referred to as the "Hall Road Cadillac dealership").

10.    The Hall Road Cadillac dealership shared a parking lot with Defendant's Honda/Used Car building.

11.    Defendant's Warren, MI dealership was located on 14 Mile Road (hereinafter referred to as the "14 Mile dealership") and was about a 20-minute drive from Defendant's Hall Road Cadillac dealership.

12.    Al-Doukhi was the only woman at the Hall Road Cadillac dealership that held a managerial role.

13.    During her employment, Al-Doukhi was the only manager at the Hall Road Cadillac dealership not given a company car or a car allowance.

14.    Al-Doukhi was also not permitted to negotiate for the benefit of a company car or car allowance, as her suggestions were always rejected.

15.    During her employment, Al-Doukhi was not permitted to use certain equipment that other managers, who were male, were permitted to use.

16.    During Al-Doukhi's employment, Al-Doukhi asked her Manager, Jim Riehl III ("Riehl III"), if she could use the snowplow truck, as she believed clearing off snow was a managerial duty that needed to be completed. Riehl

3

III replied, "Absolutely not." When Al-Doukhi asked Riehl III if it was because she was a woman, Riehl III did not answer her, and walked away.

17.    Throughout her employment, Al-Doukhi communicated to her co-workers and managers that she suffered from mental health issues and medical issues.

18.    Due to her medical issues, which included severe stomach issues, Al-Doukhi often required use of the single stall bathroom at the Hall Road Cadillac location for long periods of time, and she ate certain foods that were within her dietary restrictions.

19.    In addition, Plaintiff occasionally requested time off where she could not come in to work due her debilitating stomach pains and/or doctor's appointments.

20.    Al-Doukhi's co-workers at the Hall Road Cadillac dealership, including Elanor Knapp, Kurt Pierce, and Sales Associate Thomas Rezepka ("Rezepka"), harassed Al-Doukhi based on her medical conditions.

21.    This harassment included calling her a "cry baby," making fun of her use of the bathroom and the foods she ate, complaining when she received days off due to her medical conditions, and FaceTiming Plaintiff when they knew she was in the bathroom.

22.    Al-Doukhi reported the harassment to Riehl III and Sales

Manager Ralph Debucce ("Debucce").

23.    Riehl III and Debucce failed to take adequate remedial action in response to the employees' harassment of Al-Doukhi.

24.    To deal with the on-going harassment, Al-Doukhi refrained from eating so that she did not need to use the bathroom during the day, and/or resorted to using the bathroom at Defendant's Honda/Used Car building or the bathroom at the Walmart across the street.

25.    In December 2020, Al-Doukhi requested information regarding a medical leave due to the harassment and stomach issues she experienced. Al-Doukhi texted Riehl III, asking what she needed to fill out to take a medical leave of absence.

26.    Riehl III responded, "Get w Vickie" referring to Vickie Clark ("Clark"), Defendant's Office Manager who worked at the Honda/Used Car building.

27.    However, when Al-Doukhi asked Clark about a medical leave, Clark said that Al-Doukhi would not qualify for it, so don't even bother.

28.    In August 2021, Al-Doukhi's stomach issues worsened.

29.    On August 23, 2021, Al-Doukhi texted Riehl III and Debucce that she was admitted to the hospital for stomach issues.

30.    Riehl III asked Al-Doukhi if these were the same issues she has

been dealing with on and off, to which Al-Doukhi replied "That's what it seems like," and supplied further information.

31.    On the morning of August 24, 2021, Al-Doukhi notified Riehl III and Debucce that she would be returning to work, and texted Riehl III to schedule a time that morning to discuss her medical conditions with him.

32.    On August 24, Al-Doukhi met with Riehl III in his office, where Al-Doukhi communicated to Riehl III that her stomach issues required further treatment with her doctors at the University of Michigan.

33.    On August 24, Al-Doukhi asked Riehl III about taking a medical leave under the Family Medical Leave Act ("FMLA").

34.    However, during this meeting, Riehl III presented Al-Doukhi with an Employee Warning Notice for absenteeism concerning the day prior, August 23, 2021.

35.    Riehl III's notes on the Employee Warning Notice stated, "*She needs to be healthy to work here + has to be here consistently.*"

36.    Riehl III also told Al-Doukhi that they will only work with her if it fits Defendant's schedule.

37.    Al-Doukhi refused to sign the Employee Warning Notice and excused herself from Riehl III's office.

38.    On August 25, 2021, Defendant's Human Resources Director

Amanda Calabro ("Calabro") was presenting on COVID policies at Defendant's Hall Road Cadillac dealership.

39.    At the end of the presentation, Al-Doukhi requested to speak privately with Calabro in Al-Doukhi's office.

40.    There, Al-Doukhi requested medical leave under the FMLA due to her serious medical condition(s).

41.    Calabro stated that she needed to return to her office at the 14 Mile dealership (which was about a 20-minute drive) to email Al-Doukhi the medical leave paperwork.

42.    Calabro failed to email the medical leave paperwork to Al-Doukhi like she stated, or otherwise follow up with Al-Doukhi regarding the FMLA paperwork and/or request for medical leave.

43.    Later in the day, Rezepka called Al-Doukhi a "dumb ass" and a "fat ass" during a work-related call.

44.    Al-Doukhi reported Rezepka's conduct to Debucce.

45.    Debucce called Rezepka into his nearby office, to which Al-Doukhi overheard Debucce say, "Don't worry, she's on her way out the door so it doesn't really matter."

46.    Al-Doukhi was upset in her office after hearing this comment, and told Broker Mike Kahael that Debucce and Rezepka were talking badly about

her, and that she wanted to kill herself.

47.   Al-Doukhi then went to Clark's office at the Honda/Used Car building and told Clark that she was leaving to kill herself.

48.   Al-Doukhi also told Clark that she was sick of everyone talking about her, that she could not help it that she was sick all the time, that no one respects her, and that it is a "boys' club" at the Hall Road Cadillac dealership.

49.   At no point did Al-Doukhi tell Clark that she quit her employment with Defendant.

50.   Clark did not try to calm Al-Doukhi down, call the police, or otherwise de-escalate the situation. Instead, Clark was concerned with gathering the Employee Separation paperwork to fill out to state that Al-Doukhi was quitting.

51.   At the time Al-Doukhi left Clark's office, Clark had not drawn up an Employee Separation Form.

52.   Around noon, Al-Doukhi left Defendant's property.

53.   At 12:03 pm on August 25, Debucce texted Al-Doukhi, "does this mean you're quitting".

54.   At 5:21 pm on August 25, Al-Doukhi texted Riehl III and Debucce apologizing, and stating that she was taking a FMLA leave and would like

8

the FMLA paperwork emailed to her so it could be filled out by her doctors.

55.    Riehl III responded to Al-Doukhi's text, stating that when Al-Doukhi told Clark she quit and walked out, she no longer qualified for FMLA leave and she was not employed with Defendant anymore.

56.    Al-Doukhi replied, "I did not ever once say I quit. I said I am leaving right because I'm going to hurt myself because of how I am being treated at work and how upset I was."

57.    Riehl III replied, "[…] as far as I'm concerned you walking out and what u said to Vickie was u quitting and resigning and or job abandonment. […] You can clear out your desk Saturday morning when only service is here."

58.    Riehl III used the event on August 25 to claim that Plaintiff had quit, when in fact he terminated her employment.

59.    In the alternative, Al-Doukhi was constructively discharged from her employment on August 25, 2021.

## COUNT I
## VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

60.    Plaintiff incorporates paragraphs 1 through 59 above as if specifically repeated herein.

61.    Plaintiff was an eligible employee within the meaning of the FMLA, as:

a)    Plaintiff was employed by Defendant for a time period greater than 12 months;

b)    During the aforementioned 12 months, Plaintiff worked greater than 1,250 hours.

62.    Defendant is an employer within the meaning of the FMLA, as Defendant did employ greater than 50 employees within a 75-mile radius of Plaintiff's worksite.

63.    Pursuant to the FMLA, Plaintiff was entitled to take up to 12 weeks of FMLA leave as a result of her own serious health condition(s).

64.    Plaintiff gave Defendant sufficient notice of her intention to take a medical leave in December 2020 and in August 2021.

65.    Plaintiff gave Defendant notice that she was continuing to have serious medical issues that required further treatment.

66.    Defendant violated the FMLA by:

a)    Interfering with Plaintiff's FMLA-created right to take a medical leave when Plaintiff gave notice of her intention to take a medical leave in December 2020;

b)    Interfering with Plaintiff's FMLA-created right to take a medical leave when Plaintiff gave notice of her intention to take a medical leave in August 2021;

c)    Terminating or constructively discharging Plaintiff from her employment;

d)    Retaliating against Plaintiff for attempting to exercise her FMLA-created rights;

e)    Other violations which are yet to be discovered.

67.    Defendant willfully violated the FMLA in that it knew that such conduct was prohibited under the statute or acted in reckless disregard of whether such conduct was prohibited.

68.    As a direct and proximate result of Defendant's FMLA violations, Plaintiff has suffered, and in the future will suffer damages including, but not limited to, lost wages, employment benefits, and other compensation, past and future.

69.    Pursuant to the FMLA, Plaintiff is entitled to:

a)    All wages, salary, employment benefits, or other compensation denied or lost by reason of the violation of the FMLA;

b)    Interest;

c)    Liquidated damages;

d)    Attorney fees;

e)    Other damages/remedies available under the law;

f)    Appropriate equitable relief.

70.    Plaintiff also seeks equitable relief, including back-pay, front pay, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant, in whatever amount the Court or jury determines to be fair, just, and adequate

compensation for the injuries and damages sustained, together with interest, costs, and attorney fees. Plaintiff also seeks equitable relief; including back-pay, front-pay, or other equitable relief the Court deems appropriate.

## COUNT II
## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

71.   Plaintiff incorporates paragraphs 1 through 70 above as if specifically repeated herein.

72.   At all times relevant hereto, Plaintiff was an "employee" and Defendant was an "employer" under Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. L. § 37.1101 *et seq.*

73.   At all times relevant hereto, Plaintiff had a disability, was regarded by Defendant as having a disability, and/or had a history of having a disability under the PWDCRA.

74.   Defendant had a duty under the PWDCRA not to discharge or otherwise discriminate against Plaintiff in her employment on the basis of her disability, perceived disability, and/or history of disability.

75.   Plaintiff's disability did not affect her ability to perform the essential functions of his job, with reasonable accommodations.

76.   Defendant violated Plaintiff's rights under the PWDCRA, and Plaintiff's disability, perceived disability, and/or history of disability was a motive or reason that made a difference in Defendant's conduct, including,

12

but not limited to, the following:

    a)    Subjecting Plaintiff to a hostile work environment based on her medical condition(s);

    b)    Denying Plaintiff the reasonable accommodations submitted by her physician in July 2021 when she returned to work after surgery;

    c)    Denying Plaintiff the reasonable accommodation(s) of requested time off for her serious medical condition(s);

    d)    Failing to engage in an interactive process regarding Plaintiff's request for reasonable accommodation(s);

    e)    Terminating or constructively discharging Plaintiff from her employment;

    f)    Other acts of disability discrimination to be determined through discovery.

77.    As a direct and proximate result of Defendant's discriminatory conduct toward Plaintiff, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

    a)    Loss of wages and other compensation, both in the past and in the future;

    b)    Loss of the value of benefits, both in the past and in the future;

    c)    Loss of earning capacity;

    d)    Loss of promotional opportunities;

    e)    Extreme embarrassment, humiliation, emotional distress, mental anguish, disappointment, outrage and indignity;

13

      f)      Exemplary damages;

      g)      Attorney fees;

      h)      Other injuries and damages that become known throughout the discovery process.

78.   Plaintiff also seeks equitable relief, including back-pay, front pay, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees. Plaintiff also seeks equitable relief; including back-pay, front-pay, or other equitable relief the Court deems appropriate.

## COUNT III
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

79.   Plaintiff incorporates paragraphs 1 through 78 above as if specifically repeated herein.

80.   Employers are prohibited from violating the Elliott-Larsen Civil Rights Act (hereinafter referred to as the "ELCRA"), Mich. Comp. L. § 37.2101.

81.   The ELCRA prohibits, among other things, discrimination on the basis of "sex," which necessarily includes the employee's gender.

82.   At all times relevant hereto, Defendant was an employer within

the meaning of the ELCRA.

83.    Notwithstanding the duties owed to Plaintiff pursuant to the
ELCRA, Defendant discriminated against Plaintiff, and took adverse action
toward her because of her gender as a female, including, but not limited to:

a)    Subjecting Plaintiff to different terms and conditions of
employment based upon her gender as a female,
compared to similarly situated male employees;

b)    Failing to take prompt and appropriate remedial action after
Plaintiff complained about the Hall Road Cadillac
dealership being a "boys' club";

c)    Terminating or constructively discharging Plaintiff from her
employment;

d)    Other acts of gender discrimination to be determined
through discovery.

84.    As a direct and proximate result of Defendant's discriminatory
conduct toward Plaintiff, Plaintiff has suffered and will in the future suffer
damages including, but not limited to:

a)    Loss of wages and other compensation, both in the past
and in the future;

b)    Loss of the value of benefits, both in the past and in the
future;

c)    Loss of earning capacity;

d)    Loss of promotional opportunities;

e)    Extreme embarrassment, humiliation, emotional distress,

15

mental anguish, disappointment, outrage and indignity;

    f)    Exemplary damages;

    g)    Attorney fees;

    h)    Other injuries and damages that become known throughout the discovery process.

85.    Plaintiff also seeks equitable relief, including back-pay, front pay, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for Judgment against Defendant in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees. Plaintiff also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ *Barry S. Fagan*
    Barry S. Fagan (P34275)
    Attorneys for Plaintiff
    25892 Woodward Avenue
    Royal Oak, MI  48067-0910
    (248) 542-6300
Dated:  February 16, 2022    bfagan@faganlawpc.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY AL-DOUKHI

     Plaintiff,                      Case No. 22-cv-

-vs-

                                     Hon.

JIM RIEHL'S FRIENDLY
AUTOMOTIVE GROUP, INC.,
d/b/a JIM RIEHL'S
FRIENDLY CADILLAC,
a Domestic Profit Corporation,

     Defendant.

_____

Barry S. Fagan  (P34275)
Ryan O. Rosenberg (P84530)
FAGAN MCMANUS, P.C.
Attorneys for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
bfagan@faganlawpc.com
rrosenberg@faganlawpc.com

_____

## PLAINTIFF'S DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, by and through her attorneys, FAGAN MCMANUS, P.C., and hereby demands trial by jury on the above matter.

                             FAGAN MCMANUS, P.C.

                             By: /s/ Barry S. Fagan
                               Barry S. Fagan (P34275)
                               25892 Woodward Avenue
                               Royal Oak, MI  48067-0910
                               (248) 542-6300

Dated:  February 16, 2022          bfagan@faganlawpc.com